FILED
Jan 30 2019, 9:23 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of M.W. (Minor Child), A Child In Need of Services,

and

T.A. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

January 30, 2019

Court of Appeals Case No.
18A-JC-1534

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Jennifer Hubartt, Magistrate

Trial Court Cause No.
49D09-1804-JC-966

**Baker, Judge.**

[1] The sum total of the allegations in this Child in Need of Services (CHINS) case are as follows: two teenaged sisters got into a physical altercation and their mother sought help from law enforcement to deescalate the situation. One of the sisters appears to have some emotional and/or behavioral problems and the two girls need help to learn how to communicate in a healthier way. The mother has agreed that the family and her children need therapeutic support and has taken steps to enroll the family in those needed services. Without far more compelling evidence than appears in this case, these facts cannot, and do not, support a CHINS adjudication.

[2] T.A. (Mother) appeals the juvenile court's order finding M.W. (Child) to be a CHINS. Mother argues that there is insufficient evidence supporting the CHINS adjudication. We agree, and reverse.

## Facts

[3] Mother has three minor children: Child, L.F. (Sister), and J.A.[1] In 2011-2012, Child's father was kidnapped, remained missing for fifteen months, and found murdered when Child was about eleven years old. Mother sought out grief counseling for Child, who completed the service successfully. In 2017, Mother began individual therapy and was still participating with that service at the time of the CHINS hearing in this case. Mother and her three children live in a clean, furnished, appropriate three-bedroom home in Indianapolis; they had

---

[1] The children have different fathers, none of whom are participating in this appeal.

lived there for approximately four years at the time of the CHINS hearing. Mother has part-time employment at a childcare facility; she works part time because a disability prevents her from retaining a full-time job.

[4] Child and Sister have a volatile relationship. Child also has a history of behavioral problems, including marijuana use and suicidal ideations, and has run away from home in the past, though none of these prior incidents led to involvement with the Department of Child Services (DCS). On March 31, 2018, Child and Sister got into an argument that escalated into a physical altercation. Mother separated the girls, sending them to different parts of the house, but Child ran out of her room and into Sister's room, where they began to fight again. J.A. and Mother both tried unsuccessfully to break up the fight. Mother then called the police, seeking help to deescalate the situation.

[5] Indianapolis Metropolitan Police Department (IMPD) Officer Holly Rapier[2] responded to the dispatch. When Officer Rapier entered the home, Mother said, "'I can't do this anymore, I can't do this anymore.'" Tr. Vol. II p. 35. The officer saw Child, who had scratches on her face, and called an ambulance, which transported her to a hospital. For reasons not revealed at the CHINS hearing, Officer Rapier and another officer on the scene placed Mother in

---

[2] Officer Rapier is identified in the transcript with a first name of "Holly," tr. vol. II p. 33, and in the CHINS order with a first name of "Ha'Le," appellant's app. vol. II p. 100. We are unable to discern which spelling is correct.

handcuffs and arrested her for domestic battery. The charge was later dismissed.

[6] DCS employee Marci Mettler was sent to the home to assess the situation and ensure the children were cared for after Mother was arrested. Mettler removed the children, placing J.A. and Sister in relative care and Child in emergency shelter care.

[7] On April 3, 2018, DCS filed a petition alleging the children to be CHINS.[3] Over the course of the next month, Mother voluntarily participated in multiple child and family team meetings, family therapy, and a parenting assessment, and ensured that Child and Sister began participating in individual therapy. Mother also provided DCS with verification that she was already participating with individual therapy.

[8] On April 30, 2018, J.A. and Sister were returned to Mother's care and custody. Although Mother and Child both repeatedly asked that Child be permitted to return home, Child continued to be placed out of the home.[4]

[9] The CHINS factfinding hearing took place on May 24, 2018. At that hearing, the following testimony occurred:

- Family Case Manager (FCM) Shanika Carter testified that she believed Child, Sister, and Mother needed to participate with individual and

---

[3] DCS later dismissed J.A. from the petition.

[4] At some point, Child was moved from emergency shelter care to relative care.

family therapy and that all three had been participating with those services. FCM Carter opined that DCS's continued involvement was needed because Mother was unable to provide a "safe and emotionally stable environment." Tr. Vol. II p. 77. FCM Carter opined that Child was emotionally unstable but admitted that Child had completed a clinical assessment and had not been diagnosed with any disorders. *Id.* at 83.

- Charmaine Washington, who provided family therapy, testified that her sessions with the family had been very productive. She focused on providing Child and Sister with communication strategies and Mother with tools to express her love for both of her daughters without causing envy between the two. Washington believed that the therapy was helping the family and that the therapy should continue. She did not believe that it was time yet for Child to return to the home because she and Sister needed more time to bond and address their underlying issues. Mother was compliant, positive, and "willing to fix whatever [] problem her family might have[.]" *Id.* at 99. Mother is a "very loving Mom" and is "willing to do whatever she has to do to make sure that her children get what they need emotionally, physically." *Id.* at 101. Washington helped the family create a safety plan for what to do if Child and Sister got into another heated argument and believed that Mother would comply with the safety plan. Mother agreed to continue with family therapy and individual therapy for the girls if the CHINS case closed. *Id.* at 102. Washington did not believe that there was a threat to either Child or Sister so long as family therapy remained in place.

- Erin Bognar, who provided individual therapy for Child, testified that therapy was going well and that she believed it should continue. Bognar did not believe it was yet time for Child to return home.

- Joy Boyd provided the parenting assessment for Mother. She had no concerns about Mother's parenting skills and found that the family was "[p]retty normal" and "just functioning . . . as a family." *Id.* at 119. Mother interacts well with her children and Boyd had no safety concerns based on Mother's parenting skills.

- Richelyn Wood supervised the visits between Mother and her children. She found that the interaction was "great," that Mother is an appropriate disciplinarian and has "great parenting skills." *Id.* at 127.

- Mother testified that she likes family therapy and that, while it is not convenient because of their busy schedule, "I know there's a problem and I love my kids and I think they do need help. . . . I don't need nobody to hold my hand and force my kids to get help because I know." *Id.* at 141. Mother had already begun the process of scheduling individual therapy for her children at the center where she received her therapy. She has insurance to cover the cost of therapy for everyone and knows how to use school resources for the children if needed.

[10] On June 11, 2018, the juvenile court issued an order finding that Sister is not a CHINS but that Child is. A dispositional hearing took place on June 18, 2018.[5] Mother now appeals.

# Discussion and Decision

[11] Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only

---

[5] On July 25, 2018, DCS closed the CHINS case. This does not render the matter moot, however, as a CHINS adjudication can have professional and other ramifications for parents.

upon a showing that the decision of the trial court was clearly erroneous. *Id.*

> There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

*In re K.D.,* 962 N.E.2d 1249, 1253-54 (Ind. 2012) (footnote omitted).

[12]    Here, DCS alleged that Child was a CHINS pursuant to Indiana Code section 31-34-1-1, which provides as follows:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1)    the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2)    the child needs care, treatment, or rehabilitation that:
>
> (A)    the child is not receiving; and
>
> (B)    is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014).

[13] Quite frankly, we are stunned that the juvenile court found Child to be a CHINS. There is a dearth of evidence supporting a conclusion that her mental or physical condition was seriously impaired or seriously endangered as a result of anything done or not done by Mother. Yes, it is apparent that Child has serious behavioral issues and needs therapeutic support (though she has no diagnoses or prescribed medication), but that, alone, does not support a conclusion that she was seriously impaired or seriously endangered. Moreover, after DCS became involved, Mother agreed that Child needs therapy and intended to continue providing it. Additionally, there was *one* incident of Child and Sister engaging in a physical altercation. Again, the family needs continued therapeutic support to learn to communicate more skillfully, but this one singular incident—which Mother did her very best to deescalate by seeking the help of law enforcement—does not support a CHINS finding.

[14] Leading up to the CHINS hearing, Mother was not ordered to participate with services, but she participated—and participated well, and in good faith—with *every single service* requested by DCS, ensuring that her children did the same. When the CHINS case opened, she was already participating in therapy on her own, and in the past, she had enrolled Child in grief counseling. Mother

admitted that it is challenging to fit therapy into their busy family life but stated that she realizes that her children need further individual therapy and even found that she liked family therapy. Mother was able and willing to continue to provide all needed therapeutic support for the family, and had already begun setting up individual therapy sessions for Child and Sister at the time of the CHINS hearing.

[15] It is undisputed that Mother is a loving, engaged, and appropriate parent. It is undisputed that her home is clean, well furnished, and appropriate. It is undisputed that she is employed and able to provide adequate financial support for her children.

[16] The services provided by DCS while the CHINS case was pending gave the family a running start. The services were helping, and both Mother and Child seemed to realize it. From the outset, by calling the police, Mother showed that she simply needed some help—and she got it, through the services provided by DCS. By the time of the CHINS hearing, it was readily apparent that Child was not seriously endangered and, even more critically, that the coercive intervention of the court was not required. Under these circumstances, the juvenile court erred by finding Child to be a CHINS.

[17] The Marion County Superior Court has had multiple CHINS adjudications reversed in recent years for a notable lack of sufficient evidence. *E.g.*, *In re K.S.*, 78 N.E.3d 740, 742 (Ind. Ct. App. 2017) (finding that there was no evidence, "let alone sufficient evidence," supporting CHINS adjudication); *In re E.G. and*

*H.G.*, No. 49A02-1506-JC-488 (Ind. Ct. App. Feb. 12, 2016) (finding that the evidence, "even viewed most favorably to the judgment, cannot reasonably support an inference that Mother was likely to need the court's coercive intervention for any reason"); *In re S.M., J.M., A.M., and H.G.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015) (finding that "the record is devoid of evidence supporting" CHINS adjudication). We encourage all parties involved in the CHINS process in Marion County, including DCS, the Public Defender Agency, the trial court, and the magistrates, to be mindful of this Court's guidance when determining whether to pursue a CHINS case and whether to make a CHINS adjudication. There are unquestionably families who truly need the support of a CHINS case, and all will be better served if the involved governmental and judicial entities focus their finite resources on the families who need them, rather than on the families who do not.

[18]  The judgment of the juvenile court is reversed.


May, J., and Tavitas, J., concur.